OPINION OF THE COURT
Nicholas Colabella, J.
In a proceeding pursuant to CPLR article 78, petitioner seeks judgment (1) vacating a notice by respondents, terminating petitioner’s operation of the Government Center Garage; (2) declaring that respondents may not operate the garage as a parking facility without petitioner’s consent; and (3) awarding attorneys’ fees.
BACKGROUND
Laws of 1964 (ch 673) (adding Public Authorities Law, art 7, tit 11) created the entity known as the Yonkers Parking Authority (hereafter Authority) for the purpose of operating and maintaining parking facilities within the City of Yonkers (hereafter City).
Pursuant to that legislation, the City entered into an agreement with the Authority on December 14, 1964 (hereafter 1964 Agreement), granting the Authority "Permits of use” for certain real property being used for off-street metered parking (1964 Agreement, part 1, para 1). This included property described in Appendix A to the 1964 Agreement as the Health Center Area — block 488, lots 1, 25 and 21. The City also conveyed title to the Authority of various personalty (1964 Agreement, part 1, para 2).
The Authority agreed to "devote the property, both real and personal, hereby and hereafter transferred by the City to the Authority, exclusively for the purpose for which the Authority was created” (1964 Agreement, part 1, para 4). The Authority was to "relinquish possession of all of the real property occupied by it under the Permits of use or otherwise and to transfer legal title to all its personal property * * * to the City” upon payment of the Authority’s financial obligations or termination of the Authority, whichever occurred last (1964 Agreement, part 1, para 6).
On November 1, 1978, the City entered into an agreement with the Authority (hereafter 1978 Agreement) wherein the Authority was "authorized and designated by the City to provide all operational and maintenance services and functions necessary for the operation of the Government Center Garage” (1978 Agreement para 1). Unlike the 1964 Agree *13 ment, the 1978 Agreement stated it could be "terminated by either party upon 90 days’ notice in writing” (para 6).
The Government Center Garage was built, in part, on property previously transferred to the Authority as the Health Center Parking Area and, in part, on additional property, block 488, lot 29.
On or about February 14, 1989, the City Council adopted Resolution 46-1989, requesting respondent City Manager to send the Authority a notice of termination of the cooperation agreement for the operation of the Government Center Garage. The notice was sent on or about February 17, 1989. The City apparently intends to operate the facility itself.
DECLARATIVE RELIEF
The relief sought in this proceeding is in the nature of declarative relief and is inappropriate within the context of a special proceeding pursuant to CPLR article 78. However, such relief may be considered within an action for declaratory judgment.
Given the summary nature of the parties’ legal claims, the court converts this proceeding to a plenary action pursuant to CPLR 103 (c). The parties’ claims are determined as follows:
(1) Termination of Use
The Authority initially argues that the right to use and occupy the Government Center Garage extends to the end of its corporate existence, despite the 90-day termination provision in the 1978 Agreement: (1) by operation of the provision in Public Authorities Law § 1596-f (1), that the Authority shall have a life interest in property conveyed to it from the City; and (2) by virtue of the permit of use granted for the Authority’s life for the Health Center Parking Area on which the Government Center Garage was partially built. The City contends that the above are inapplicable under the terms of the 1978 Agreement.
The term "convey” is indirectly defined in Public Authorities Law § 1596-f (1) by its description of toe effects of a conveyance: "In [the] case of real property so conveyed, the title thereto shall remain in the city but the authority shall have the use and occupancy thereof for so long as its corporate existence shall continue.” The legislative intent, that the right to use property shall be for the Authority’s life, is *14 repeated in a parallel provision in Public Authorities Law § 1596-f (4) with regard to property obtained by the Authority in the City’s name through condemnation.
As used by the parties historically, convey has referred to the transfer of property rights (see, General Ordinance No. 63-1964; 1964 Agreement, part 1, para 4). The authorization to operate and maintain the Government Center Garage in the 1978 Agreement was equivalent to the permits by which the use of property was transferred or conveyed to the Authority in the 1964 Agreement for the life of the Authority. Although a maximum term is unspecified in the 1978 Agreement, a life interest is implied by the above statute and the 1964 Agreement which, in its preamble, refers to a "permanent, coordinated system of parking facilities”, and, in part 1, paragraph 3, states that the "city may from time to time at the request of the Authority grant Permits of Use of additional real property * * * subject to reversion as provided in the Yonkers Parking Authority Act.”
The Public Authorities Law addresses reversion in only two limited circumstances:
(1) Public Authorities Law § 1596-f (5) provides that "[i]n case the authority shall have the use and occupancy of any real property which it shall determine is no longer required for a project then, if such real property was acquired at the cost and expense of the city, the authority shall have power to surrender its use and occupancy thereof to the city”.
(2) Public Authorities Law § 1596-q states that "[wjhenever all of the bonds issued by the authority shall have been redeemed or canceled, and all its liabilities met or discharged, and the termination date of its corporate existence as set forth in section fifteen hundred ninety-six-c of this title shall have been reached, the authority shall cease to exist and all rights, titles and interests and all obligations and liabilities thereof vested in or possessed by the authority shall thereupon vest in and be possessed by the city of Yonkers”.
Reversion is also implied in the 1964 and 1978 Agreements, if the Authority ceases to utilize the property for the purposes for which it was transferred (see, 1964 Agreement, part 1, para 4; 1978 Agreement para 7). The latter is consistent with the Public Authorities Law since a use of property for other than parking-related functions would violate the Authority’s corporate purpose.
In specifying the type of contracts that the parties could *15 make in Public Authorities Law § 1596-f (3), the Legislature evinced an intent to restrain the parties’ capacity to contract within the parameters of the act: "Contracts may be entered into between the city and the authority providing for the property to be conveyed by the city to the authority, the additional property to be acquired by the city and so conveyed, the streets, roads, parkways, avenues, and highways to be closed by the city and the amounts, terms and conditions of payment to be made by the authority. Such contracts may also contain covenants by the city as to the road,’ street, parkway, avenue and highway improvements to be made by the city. Any such contracts between the city and the authority may be pledged by the authority to secure its bonds and may not be modified thereafter except as provided by the terms of the pledge.”
The 90-day cancellation provision is in derogation of the Public Authorities Law in providing an unconditional right of termination unrelated to the circumstances described above. It defeats the legislative intent of Public Authorities Law § 1596-f (1) to grant to the Authority exclusive control of property once the use is transferred to it.
The 90-day cancellation provision is also in conflict with the permit of use afforded the Authority in 1964 for the Health Center Parking Area which transferred that property to the Authority’s use for the Authority’s life. The Authority has retained that right — having neither transferred that land back to the City nor abandoned its use of same.
Construction of part of the Government Center Garage on that land was done with the Authority’s tacit consent on the assumption that the facility would be conveyed to the Authority on completion. Enforcement of the cancellation provision for the Government Center Garage now would yield the incongruous result that, although the Authority would have the right to use the real property on which the garage sits, it would be prevented from doing so.
Enforcement of the cancellation provision creates a further anomaly if the anticompetition clause in the 1964 Agreement is enforced, discussed below. In that event, although the City would be allowed to terminate the Authority’s operation of the Government Center Garage, no other entity could operate the facility in its place. Accordingly, the petition is granted insofar as it seeks to declare the notice of termination to be void.
*16 (2) Covenant Against Competition
The Authority’s argument, that the City is barred from operating the Government Center Garage, is based on the anticompetition clause in the 1964 Agreement. The City counters that that provision was overridden by Laws of 1971 (ch 491) which provided the following: "Notwithstanding any provisions of any general, special or local law to the contrary, the city of Yonkers is authorized to construct, operate and maintain parking facilities within the city of Yonkers and to finance the construction of parking facilities in accordance with the provisions of the local finance law.”
The above did not abrogate the covenant against competition in the 1964 Agreement. According to legislative memoranda, chapter 491 was a response to a request by the City’s bond counsel to clarify confusion created by Public Authorities Law § 1596-k (2). The latter section provides that the Authority may covenant with bondholders that no parking facilities except "those acquired and operated by the authority will be constructed or operated in the city by the city”. Chapter 491 was intended to make clear that the City was not preempted thereby from building and financing facilities such as the Government Center Garage.*
By its terms, chapter 491 only superseded the provisions of any "general, special or local law to the contrary”. Nothing in chapter 491 or in the Public Authorities Law precluded the City from contractually giving up its right to compete. Had chapter 491 contained language overriding the parties’ 1964 Agreement, it would have constituted an unconstitutional impairment of an existing contractual obligation (Patterson v Carey, 41 NY2d 714). Consequently, absent language in the 1978 Agreement superseding the 1964 Agreement, the City remains bound by the covenant against competition.
(3) Attorneys’ Fees
The predicate for the Authority’s request for attorneys’ fees is paragraph 5 (d) of the 1978 Agreement which requires the City to "[pjrovide legal services as are necessary to the opera *17 tian of the Garage.” Application is granted based on that provision to the extent counsel shall submit a retainer statement and affirmation of services rendered in support of an award of reasonable attorney fees. Absent a request for a hearing as to the nature of the services performed, the fees to be awarded shall be determined on papers.

 Mem of City Manager Scher dated May 20, 1971, and letter of Sauerwald, Associate Counsel to the Office for Local Government dated May 26, 1971.